UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JEFFREY SINGER and ANDREW SINGER,

Plaintiffs,                          Case No. 10-CV-8501 (KMK)

                -v-                                      OPINION & ORDER

XIPTO INC.,

                Defendant.

<u>Appearances:</u>

Anthony Paul Luisi, Esq.
Joshua E. Kimerling, Esq.
Cuddy & Feder, LLP
White Plains, New York
*Counsel for Plaintiffs*

Evan Stone Rothfarb, Esq.
Rothfarb Law, PLLC
New York, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Plaintiffs Jeffrey and Andrew Singer ("Plaintiffs") claim that they invested in Defendant

Xipto Inc. (Defendant) pursuant to a contract, and that their monies have not been returned, in

breach of that contract, or, in the alternative, as an act of unjust enrichment by Defendant.

Defendant moves to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Plaintiffs move

for summary judgment, pursuant to Fed. R. Civ. P. 56. For the reasons stated herein, Plaintiffs'

motion is denied; Defendant's motion is granted in part and denied in part.

I.  BACKGROUND

A.  Facts

For purposes of Defendant's Motion to Dismiss, the Court assumes the allegations in Plaintiffs' Complaint to be true.  However, for purposes of Plaintiffs' Summary Judgment Motion, the Court notes where there is a dispute over the facts, and does not take Plaintiffs' allegations to be true.

Plaintiffs describe Defendant as a "ringback tones" advertising business, which places selected advertising content on the tones heard by a mobile phone caller while waiting for a recipient to answer a phone call.  (Compl. ¶ 17.)  Defendant's business model allegedly relies in part upon coordination with mobile network operators who maintain the default ring tones heard by callers.  (*Id*. ¶ 18.)

The Parties agree that a written document, entitled the "Convertible Bridge Note Financing Term Sheet" ("Term Sheet"), provided that each Plaintiff would make an investment of at least $50,000, but no more than $800,000, in the form of unsecured promissory notes ("Notes") in Defendant's business.  (Compl. ¶ 23; Pls.' Statement of Undisputed Facts Pursuant to L.R. 56.1 ("Pls.' 56.1") ¶ 2; Def.'s Resp. to Pls.' L.R. 56.1 Statement of Facts ("Def.'s 56.1") ¶ 2.)[1]  The Term Sheet contains several provisions relevant to the instant motions.  First, the

---

[1] Though not attached to the Complaint, Defendant has provided the Court with the Term Sheet.  Because the Term Sheet is explicitly referenced in the Complaint, it is proper for the Court to consider it in deciding Defendant's Motion to Dismiss.  *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005) (noting that where a plaintiff has "relied on the terms and effect of a document in drafting the complaint," the document is otherwise "integral to the complaint," and may be considered in deciding a motion dismiss, even if not formally incorporated by reference (alteration and internal quotation marks omitted)); *Verzani v. Costco Wholesale Corp.*, 641 F. Supp. 2d 291, 297-98 (S.D.N.Y. 2009) (noting that "where the claim is for breach of contract, the complaint is deemed to incorporate the contract by reference because the contract is integral to the plaintiffs' claim").

Term Sheet states that is "non-binding," and would be "consummated upon execution of a definitive Note Purchase Agreement."  (Pls.' 56.1, Ex. 1.)  Plaintiffs do not allege that a Note Purchase Agreement was ever executed, and, in fact, Defendant claims that the referenced Note Purchase Agreement never was drafted or executed.  (Def.'s 56.1 second numbered ¶ 9.) Second, the Term Sheet includes a "Due Date" section.  By its terms, the Notes are due "[o]n demand . . . any time on or after the 18 month anniversary of the applicable issuance of the Notes (the '[m]aturity [d]ate')."  (Pls.' 56.1, Ex. 1.)

Third, the Term Sheet contains provisions for conversion of the Notes into stock in the event, or non-event, of qualified financing ("qualified financing provision").  If qualified financing, meaning "the first sale of capital stock of [Defendant] with immediately available gross proceeds . . . of at least $1,000,000," occurred before the 18-month maturity date, then the Notes, including "all principal and interest [would] automatically convert into shares of . . . capital stock . . . issued to investors."  (*Id*.)  If, on the other hand, such a qualified financing sale of capital stock did not occur before the 18-month maturity date, then the Notes "at the option of the holder thereof [would] become convertible into shares of common stock of the [Defendant]" at 80 percent of their "current fair market value."  (*Id*.)  No Party alleges that the qualified financing ever materialized.

Fourth, and most relevant to the instant motions, the Term Sheet includes a so-called "acceleration clause" that Plaintiffs claim allowed them to convert their investments into repayable loans at 8 percent interest in advance of the 18-month maturity date, unless a separate agreement was reached between Defendant and one of four named mobile network operator companies within three months of the Parties' agreement.  This acceleration clause provides:

3

> At any time after three (3) months following the closing date of this agreement, at the option of the investor, the promissory note or loan may be converted to a loan carrying an interest rate of 8% per annum, unless one of the following events occur: a) the agreement between Xipto and Verizon is signed; or b) an agreement placing Xipto's platform in service with ATT, Orange, or Vodafone is signed. Repayment of this loan will be required within 30 days from the date of written notice of this election being given by the investor.

(Compl. ¶¶ 22, 28; Pls.' 56.1, Ex. 1.)  The Term Sheet is dated "[o]n or about May 3rd, 2010."

(Pls.' 56.1, Ex. 1.)

Two nearly identical Memoranda of Understanding ("MOUs"), dated May 3 and 5, 2010, were created and covered each individual Plaintiff and Defendant.  (Pls.' 56.1, Ex. 2.)[2]  Both MOUs are signed by Anthony DiCio, on behalf of Xipto, but one of the MOUs is signed by Plaintiff Jeffrey Singer, while the other one, marked for Plaintiff Andrew Singer, is not signed by him.  (Id.)  The MOUs provide that each individual Plaintiff agrees to lend Defendant $50,000 "using the terms as outlined" in the Term Sheet, which "may be substituted after attorney review," but that the "terms and conditions agreed will not be changed."  (Id.)

Plaintiffs claim that the Term Sheet and the MOUs collectively constitute the entirety of the contract between the Parties.  (Compl. ¶¶ 23, 24; Mem. of Law in Supp. of Pls.' Summ. J. Mot. ("Pls.' Mem.") 8-9; Reply Mem. of Law in Supp. of Pls.' Summ. J. Mot. ("Pls.' Reply Mem.") 6.)  Defendant, in contrast, contends that "[t]hroughout April and May of 2010" the Parties engaged in negotiations which "resulted in two identical complex oral agreements" that predated the Term Sheet and MOUs; the latter documents were drafted "[i]n an attempt to formalize the [] oral agreement[s]," but did not "embody all of [their] terms."  (Decl. of Anthony

---

[2] As with the Term Sheet, the MOUs have been provided to, and are properly considered by, the Court.

DiCio in Opp'n and Reply to Pls.' Cross-Mot. ("DiCio Decl.") ¶¶ 4, 6, 8; Def.'s 56.1 second numbered ¶¶ 1-3.)

Defendant describes these oral agreements as predicated upon an 18-month maturity date.  According to Defendant, under this arrangement Plaintiffs had the option of demanding their investment funds plus 8 percent interest at any time "but [Plaintiffs] would not receive payment until after the lapse of an 18-month maturity date."  (DiCio Decl. ¶ 7; Def.'s 56.1 second numbered ¶¶ 4-5.)  If Plaintiffs exercised the acceleration clause, then, in Defendant's view, they would be paid "30 days after the maturity date."  (DiCio Decl. ¶ 7.)  Defendant further describes the oral agreements as *requiring* Plaintiffs, after three months, either to convert the Notes to loans (repayable 30 days after the maturity date) or convert the Notes to common stock, unless one of two conditions occurred: (1) Defendant reached a separate agreement with a mobile network, which would forestall Plaintiff's required decision from three months until the 18-month maturity date; or (2) a qualified financing occurred, which would have "already converted [the Notes] into capital stock."  (*Id*.)  Under Defendant's characterization of these oral agreements, Plaintiffs would have a "right to repayment of their two $50,000.00 investments [on] December 3 and 5, 2011," 30 days after the respective maturity dates of the purported oral agreements between the Parties.  (Def.'s 56.1 second numbered ¶ 5; DiCio Decl. ¶¶ 6-7.)

It is undisputed that each Plaintiff tendered $50,000 to Defendant, which was received and deposited in its accounts without condition.  (Compl. ¶ 25; Pls.' 56.1 ¶ 8; Def.'s 56.1 ¶ 8.) The Parties further agree that Plaintiffs sent a written demand letter to Defendant on August 5, 2010, claiming to exercise their rights under the acceleration clause and convert the $100,000

into a loan, with interest, due and payable within 30 days afterward.[3]  (Def.'s 56.1 ¶ 11.)  Thus, Plaintiffs claim that repayment was owed on September 4, 2010.  (Compl. ¶ 30.)  During the 30-day period, Plaintiffs claim that Defendant repeatedly "acknowledged the debt due and owing to Plaintiffs." (Compl. ¶ 34.)

Defendant disputes this.  (Def.'s 56.1 second numbered ¶ 21.)  For example, Defendant claims that on July 8, 2010 (nearly a month prior to Plaintiffs' demand letter) it "consummated an agreement with Muzicall Ltd." that would place its "proprietary platform in service on the Orange and Vodafone mobile telephone networks."  (Def.'s 56.1 second numbered ¶ 14; DiCio Decl. ¶ 26.)  Defendant further claims that the July 8 agreement with Muzicall was "superceded and replaced by a long-form agreement [five months later] on December 2, 2010."  (DiCio Decl. ¶ 28.)

Defendant did not return the $100,000 to Plaintiffs, nor make any interest payments (Compl. ¶ 39; Def.'s 56.1 second numbered ¶ 13, 16), on the theory that the August 5, 2010 demand letter only converted investments into loans which would not be due until 30 days after the 18-month maturity date.  (Def.'s 56.1 second numbered ¶ 16.)  Defendant claims that the repayment deadlines would have occurred on "December 3 and 5, 2011, respectively."  (*Id.*)

B. Procedural History

On October 13, 2010, Plaintiffs served Defendant with a Summons and Complaint, having initiated this action in New York State Supreme Court in Westchester County.  On November 10, 2010, Defendant removed this action, without objection from Plaintiffs, asserting that the Court has jurisdiction based on the Parties' diversity.

---

[3] Defendant does not concede the legal significance of Plaintiffs' demand letter, only that the demand was made.  (Def.'s 56.1 ¶ 11.)

Though there has been no discovery, Plaintiffs have filed a motion for summary judgment on two causes of action for breach of contract and unjust enrichment (Dkt. No. 7; Compl. ¶¶ 42, 48), and Defendant has filed a motion to dismiss the complaint. (Dkt. No. 13.) While the motion was pending before this Court, the 18-month maturity date within the Term Sheet passed in early December 2011. At a subsequent status conference before the Court on December 19, 2011, the Parties agreed that, even under Defendant's description of the written and oral agreements, the principal investment amount and interest would be due on December 3 and 5, 2011. (Dkt. No. 23; Def.'s Mem. of Law in Supp. of its Mot. to Dismiss ("Def.'s 12(b)(6) Mem.") 2 ("Plaintiffs must wait until December 3 and 5, 2011 for their repayment rights to become effective . . . [when they will] be entitled to full recoupment of their loans along with the accrued interest, calculated at 8% simple interest per annum.").) Given these developments, the Court afforded the Parties until January 9, 2012 to supplement their briefing. (*Id*.) The Court received nothing from the Parties.

In both causes of action, Plaintiffs claim damages of $100,000, statutory interest, costs and attorneys' fees, from September 2010. (Compl. ¶¶ 47, 50.) On the breach of contract claim, Plaintiffs also claim punitive damages. (*Id*. ¶ 47.)

## II. DISCUSSION

### A.  Defendant's Motion To Dismiss

#### 1.  Standard of Review

Defendant brings its Motion to Dismiss under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6). The Rule 12(b)(1) motion is predicated on the claim that because Defendant did not owe Plaintiffs any re-payments until at least December 2011, more than a year after the Complaint was filed, Plaintiffs' claims were not ripe when the Complaint was filed. (Def's Mem. 16-17.)

In the alternative, Defendant argues that Plaintiffs have failed to state a claim, either for breach of contract or for unjust enrichment.

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008); *see also Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) ("We review the district court's grant of a Rule 12(b)(6) motion to dismiss de novo, accepting all factual claims in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."). Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Yung v. Lee*, 432 F.3d 142, 146 (2d Cir. 2005) (noting that in ruling on a Rule 12(b)(6) motion a court considers the allegations in the complaint and any "written instrument" that is "integral" to the complaint).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alterations, citations, and internal quotation marks omitted). Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. A plaintiff must allege

8

"enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

Ripeness is jurisdictional and properly considered on a motion to dismiss pursuant to Rule 12(b)(1). *See Auerbach v. Bd. of Educ.*, 136 F.3d 104, 108-09 (2d Cir. 1998). In considering a Rule 12(b)(1) motion a federal court has subject-matter jurisdiction over a cause of action only when it "has authority to adjudicate the cause" raised in the complaint. *See Sinochem Int'l Co. v. Malay Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007). "Determining the existence of subject matter jurisdiction is a threshold inquiry, and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008) (internal citations and quotation marks omitted), *rev'd on other grounds*, 585 F.3d 559 (2d Cir. 2009). "When jurisdiction is challenged, the plaintiff bears the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists, and the district court may examine evidence outside of the pleadings to make this determination." *Id.* (internal citations and quotation marks omitted). "[T]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (alteration in original) (internal citations and quotation marks omitted), *aff'd*, 130 S. Ct. 2869 (2010).

### 2.  Plaintiffs' Breach of Contract Claim

Under New York law, "a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011); *see also Eternity Global*

9

*Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (same) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996))); *Brualdi v. IBERIA*, 913 N.Y.S.2d 753, 754 (App. Div. 2010) (same).[4]

Defendant argues that the Term Sheet and the MOUs are not final agreements, as the Term Sheet itself contemplates the execution of a further instrument (the Note Purchase Agreement) to "consummate[]" the transaction.  (Pls.' 56.1, Ex. 2.)  While "[o]rdinarily, preliminary manifestations of assent that require further negotiation and further contracts" are not enforceable, *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996), "[i]n some circumstances . . . preliminary agreements can create binding obligations."  *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998).  To guide courts in deciding whether a preliminary agreement creates binding obligations, the Second Circuit has endorsed the framework laid out by then District Judge Leval in *Teachers Insurance & Annuity Ass'n v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987).  *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 71-72 (2d Cir. 1989) (adopting *Tribune*'s framework); *see also Vacold LLC v. Cerami*, 545 F.3d 114, 124-25 (2d Cir. 2008) (same); *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005) (same); *Adjustrite Systems,* 145 F.3d at 547-48 (same); *Shann*, 84 F.3d at 77 (same).

In *Tribune*, Judge Leval observed that agreement on each detail of a contract was not enough to create a binding obligation; there had to be an agreement to enter into a binding

_____

[4] The Parties have briefed the motions on the apparent assumption that New York law applies without explicitly stating what law governs.  This is sufficient for the Court to apply New York law.  *See Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 61 (2d Cir. 2004) ("Here, the parties' briefs assume that New York law controls this issue, and such implied consent is sufficient to establish choice of law." (internal quotation marks and alteration omitted)); *Prince of Peace Enters. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 397 (S.D.N.Y. 2011) ("[T]he parties have consented to application of New York law by briefing all issues under the law of [N]ew York.").

contract. *Arcadian*, 884 F.2d at 72 (citing *Tribune*, 670 F. Supp. at 497).  As such, Judge Leval

differentiated between two types of agreements.  "In the first, the parties have reached complete

agreement on all of the issues that require negotiation, but they have not yet completely

formalized their agreement.  In the second, the parties have committed themselves to some major

terms, but some terms [still] remain to be negotiated . . . ."  *Id.* (citing *Tribune*, 670 F. Supp. at

498).  The first type of agreement is referred to as a Type I agreement; the second, not

surprisingly, a Type II agreement.  *See Vacold*, 545 F.3d at 124.

Courts apply a four-part test in determining whether parties to a Type I agreement should

be bound by its terms:

> (1) whether there has been an express reservation of the right not to be bound in
> the absence of a writing; (2) whether there has been partial performance of the
> contract; (3) whether all of the terms of the alleged contract have been agreed
> upon; and (4) whether the agreement at issue is the type of contract that is usually
> committed to writing.

*Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1988).[5]  Evaluating these factors,

however, is not a "talismanic scorecard."  *Vacold*, 545 F.3d at 125.  "The ultimate issue, as

always, is the intent of the parties: whether the parties intended to be bound, and if so, to what

extent."  *Id.* at 125 (internal quotation marks omitted).  In assessing intent, "courts [generally]

---

[5] *Winston* arose in the context of a preliminary oral agreement.  Nonetheless, the test articulated in that case has been applied to written agreements, including unsigned ones.  *See Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 323 (2d Cir. 1997) (applying *Winston* factors in the context of an unexecuted draft settlement); *Winn v. Seaport Manor Corp.*, No. 01-CV-5349, 2002 WL 31133388, at *2 (S.D.N.Y. Aug. 22, 2002) (using *Winston* factors with respect to an unsigned draft of a settlement stipulation).  The Second Circuit has also used a modified form of the *Winston* factors for a Type II agreement.  These consist of: (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.  *See Arcadian,* 884 F.2d at 72 (citing *Tribune*, 670 F. Supp. at 499-503); *see also Adjustrite Systems*, 145 F.3d at 549 n.6.

look solely at objective signs of intent, and do not consider subjective evidence of intent." *See Phansalkar v. Andersen Weinroth & Co.*, No. 00-CV-7872, 2001 WL 1524479, at \*25 (S.D.N.Y. Nov. 29, 2001), *rev'd in part*, 344 F.3d 184 (2d Cir. 2003).

The Second Circuit has noted both that "each [factor] provides significant guidance," and that the first factor is the most important in the context of a binding preliminary commitment. *See Hostcentric Tech., Inc. v. Republic Thunderbolt, LLC*, No. 04-CV-1621, 2005 WL 1377853, at \*7 (S.D.N.Y. June 9, 2005); *see also Adjustrite Systems*, 145 F.3d at 549 (noting that the first factor is the most important); *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 576 (2d Cir. 1993) ("Although no single factor may be decisive, we believe that where applicable each provides guidance."); *Krauth v. Exec. Telecard, Ltd.*, 890 F. Supp. 269, 293 (S.D.N.Y. 1995) ("The Second Circuit has at various times stated that no single factor is decisive, but each provides significant guidance . . . . But the Second Circuit has also stated, in the context of a binding preliminary commitment, that the first factor is the most important." (internal citations and quotation marks omitted)).

The strongest indication of objective intent arises from an express, written reservation not to be bound. Thus, "if the language of the agreement is clear that the parties did not intend to be bound, the Court need look no further." *See Cohen v. Lehman Bros. Bank*, 273 F. Supp. 2d 524, 528 (S.D.N.Y. 2003) (citing *Arcadian*, 884 F.2d at 72); *Nielsen Media Research, Inc. v. Microsystems Software, Inc.*, No. 99-CV-10876, 2002 WL 31175223, at \*6 (S.D.N.Y. Sept. 30, 2002). It is this axiom that Defendant seizes upon, for the May 3rd Term Sheet contains such express language indicating that it is non-binding and will not be binding until the "execution of a definitive Note Purchase Agreement." (Pls.' 56.1, Ex. 1.) Viewed in isolation, the Term Sheet might very well qualify as a "non-binding 'agreement to agree,'" *Bell v. Stephens*, No. 05-CV-

12

7182, 2007 WL 831815, *3 (S.D.N.Y. Mar. 13, 2007), where the Parties' intent to form a contract is unclear and therefore unenforceable.

The Term Sheet, however, cannot be viewed in isolation.  The MOUs, which incorporate the Term Sheet by reference, suggest that the Parties did intend to be bound by operation of the two documents together.  *See This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) ("Under New York law, all writings forming part of a single transaction are to be read together."); *see also Kelso Enters. Ltd. v. A.P. Moller-Maersk A/S*, 375 F. App'x 48, 49 (2d Cir. 2010) (summary order) ("[W]hen interpreting a contract or multiple contracts in a transaction, we strive to give effect to all of the terms of the relevant documents, reading them together."); *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 263 (2d Cir. 1965) ("[I]t is both good sense and good law that these closely integrated and nearly contemporaneous documents be construed together." (internal quotation marks omitted)).  For example, the MOUs note that the Parties "have reached the following points of agreement" and that each individual plaintiff "*agrees to lend* [Defendant] $50,0000/100 *immediately*."  (Pls.' 56.1, Ex. 2 (emphasis added).)  The MOUs also provide for their own finality by noting that while the Term Sheet may be substituted after attorney review, the "terms and conditions agreed will not be changed."  (*Id.*)  Likewise, the Term Sheet, while non-binding, indicates an "[i]nitial closing" date "[o]n or about May 3rd 2010," suggesting that the MOUs, executed within days of May 3rd, constituted a binding preliminary agreement.[6]  (Pls.' 56.1, Ex. 1.)  Furthermore, the MOUs are both signed by

---

[6] Defendant places great emphasis on a reference in Plaintiffs' August 5, 2010 demand letter that Plaintiff Jeffrey Singer executed his MOU on April 28, 2010, rather than on May 4 as the face of that document indicates.  (Mem. in Opp'n and Reply to Pls.' Cross-Mot. ("Def.'s Opp'n Mem.") 17-18.)  Defendant also contends that because the MOU has an issuance date of May 3, 2010 but Plaintiff Jeffrey Singer's signature date was May 4, 2010, "[t]he effective dates of the investments are also indefinite and inconsistent."  (*Id.* at 17.)  From this, Defendant avers

Defendant, evincing an intent to be bound.  In the case of Plaintiff Jeffrey Singer, in fact, the MOU is fully executed by both parties.  In the case of Plaintiff Andrew Singer, a virtually identical MOU had only been signed by Defendant's representative.

The second factor likewise supports Plaintiffs, particularly in light of the (apparently undisputed) allegation that Plaintiffs fulfilled partial performance through their $50,000 payments to Defendant.  *See H & H Acquisition Corp. v. Fin. Intranet Holdings,* 669 F. Supp. 2d 351, 359-60 (S.D.N.Y. 2009) ("Perhaps the strongest indication that a party has assented to a contract is when that party accepts the benefits of the agreement without reservation."); *see also Palumbo v. Norstar Bank Upstate N.Y.,* 622 N.Y.S.2d 263, 263-64 (App. Div. 1995) (holding that plaintiffs had ratified an agreement where there was performance and an acceptance of benefits).  Defendant counters that the partial performance was actually in fulfillment of prior binding oral contracts between the parties.  Specifically, Defendant submits that the oral agreements were formed prior to March 2010, after which drafts of the Term Sheet and MOU were circulated to "formalize" the oral agreements, and payment was made after the execution, whether complete or partial, of the MOUs.  (Mem. in Opp'n and Reply to Pls.' Cross-Mot. ("Def.'s Opp'n Mem.") 3; DiCio Decl. ¶¶ 6-8.)  Of course, whatever may be said of Defendant's assertion, at this point substantiated only by DiCio's somewhat vague affidavit, it has no bearing

---

that "the clear inference" is that the MOUs were intended as one of a series of non-binding drafts.  (*Id.* at 18.)

The Court finds no such exclusive inference.  The plain meaning of the "issuance date" on the MOUs simply refers to the date the document was "issued" or was made available to be executed.  That one MOU was issued on May 3, 2010 and executed by Plaintiff Jeffrey Singer the next day, therefore, is not inconsistent and does not gives rise to an inference of multiple drafts.  Likewise, the reference in the August 5, 2010 demand letter to an April 28 execution date hardly makes Plaintiffs' claims implausible, as the reference to April 28 may have simply been mistaken, an issue which may very well be the subject of discovery but is not grounds to dismiss the Complaint.

14

on whether Plaintiffs have stated a plausible claim against Defendant, which the Court finds, as to this factor, that Plaintiffs have done.

The third factor also favors Plaintiffs as the "essential terms [had] been agreed upon," in the written document. *Shann*, 84 F.3d at 77. Defendant would have the Court look to the language in the Term Sheets only, which conditions consummation of the transaction upon execution of a Note Purchase Agreement that would contain "customary covenants, representations and warranties." These provisions, however, do not convey any indication of open terms that have yet to be negotiated. Put differently, it is not relevant that "the parties recognize[] that the final contract would include additional 'boilerplate'" if there are "no disputes relating to the boilerplate." *See id.* at 77-78 (noting also "all that remained was the need for lawyers' embellishments"); *see also Vacold*, 545 F.3d 114, 129 (finding that a preliminary agreement contemplating an undrafted stock purchase agreement with "standard" representations had not left disputes open to be negotiated). This is particularly true here where the MOUs provide that the Term Sheet could be substituted "after attorney review, to ensure compliance with applicable laws and regulations," but that the "terms and conditions would not be changed."[7] (Pls.' 56.1, Ex. 2.)

---

[7] Defendant directs the Court's attention to the August 5, 2010 letter, which notes that "it was not decided" whether the 8 percent interest within the acceleration clause was simple or compounded. (Def.'s Opp'n Mem. 18; Pls.' 56.1, Ex. 3.) The letter, however, never mentions any negotiations which were to have taken place after the execution of the MOUs. On its face, therefore, it is an acknowledgment (at most) by Plaintiffs of contractual ambiguity on one point, rather than an admission that negotiations were ongoing. In any event, the undecided nature of the interest is only relevant if it is an "essential" or "material" term of the Parties' bargain. *See Vacold*, 545 F.3d at 129 (noting there was "no evidence" that "parties left material terms of their agreement open"); *Shann*, 84 F.3d at 77 (noting that a Type I agreement is one where "all essential terms" have been agreed upon); *but cf. Winston*, 777 F.2d at 82-83 (holding in the context of an oral agreement followed by several contentious written drafts that disagreement over "minor" points showed an intent not to be bound). Plaintiffs' letter, which readily

The fourth and final factor, whether the agreement is of a type typically reduced to writing, is largely immaterial in the present context. *See e.g.*, *Vacold,* 545 F.3d 125 (noting that in the context of the case, "this factor is of little help").  While it might be argued that financial arrangements of the sort at issue here often are formalized through written documentation, it is also true that "[o]ral contracts for the sale of securities are sufficiently common that the Uniform Commercial Code [UCC] and statutes of fraud in every State now consider them enforceable." *Wharf (Holdings) Ltd. v. United Int'l Holdings*, *Inc.*, 532 U.S. 588, 595 (2001).

In the end, then, the Court finds that Plaintiffs have stated a plausible claim of breach of contract.  Read together, the MOUs and Term Sheets reflect the terms and conditions under which Plaintiffs would invest $100,000 in Defendant, and how that investment could be treated and repaid by Defendant.  Moreover, if taken as true, Plaintiffs' allegations establish a plausible claim that Defendant breached the financing arrangement (August 2010) before the Complaint (October 2010) was filed, thus making Plaintiffs' causes of action ripe.  Therefore, Defendant's motion to dismiss the breach of contract claim is denied.

### 3.  Plaintiff's Unjust Enrichment Claim

Defendant also moves to dismiss Plaintiffs' unjust enrichment claim as precluded by their breach of contract claim.  While a party generally may not simultaneously recover upon a breach of contract and unjust enrichment claim arising from the same facts, it is still permissible to plead such claims as alternative theories.  *See Fantozzi v. Axsys Techs., Inc.*, No. 07-CV-2667, 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008); *Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 347 F. Supp. 2d 1, 4 (S.D.N.Y. 2004) (noting that a "plaintiff may simultaneously allege breach

---

"decide[s] not to hold [Defendant] liable for the [higher] amount" of interest, plausibly demonstrates that the nature of the interest was a peripheral concern.  (Pls.' 56.1, Ex. 3.)

of contract and unjust enrichment in its complaint").  Here, the Parties have not agreed that a single, enforceable contract governs their dispute.  Thus, it is not settled that an enforceable contract exists which would preclude equitable remedies such as unjust enrichment.  Plaintiffs, moreover, have plausibly stated an unjust enrichment claim by identifying an underlying benefit that was conferred upon Defendant by virtue of the alleged failure by Defendant to return the $100,000 to Plaintiffs.  *See MacDraw Inc. v. CIT Grp. Equip. Fin.*, 157 F.3d 956, 963 (2d Cir. 1998) (per curiam) (noting that an unjust enrichment claim requires identification of a conferred benefit which unjustly enriched the defendant).  Accordingly, Defendant's motion to dismiss the unjust enrichment claim is denied as well.

### 4.  Plaintiff's Attorneys' Fees and Punitive Damages Claims

Plaintiffs also seek attorneys' fees and a judgment that includes punitive damages. (Compl. ¶ 47.)  However, the Court agrees with Defendant that Plaintiffs' demand for attorneys' fees should be dismissed.  New York follows the "American Rule" regarding attorneys' fees, *see A.G. Ship Maintenance Corp. v. Lezak*, 503 N.E.2d 681, 683 (N.Y. 1986), under which "it is well established that attorney's fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor."  *Summit Valley Indus., Inc. v. Local 112 United Bhd. of Carpenters & Joiners*, 456 U.S. 717, 721 (1982) (internal quotation marks omitted); *see also Oscar Gruss & Son. Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003) ("Under the general rule in New York, attorneys' fees are the ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized by agreement between the parties, statute, or court rule.").

Plaintiffs have not alleged that attorneys' fees were authorized by their contract with Defendant.  Indeed, they point to no provision providing for such fees.  Thus, while New York courts have recognized exceptions to the American Rule, *see Versatile Housewares &*

*Gardening Sys., Inc. v. Thill Logistics, Inc.*, No. 09-CV-10182, 2011 WL 2566061, at *9 (June

29, 2011) (collecting cases), Plaintiffs have not argued that any specific exception applies here.

Moreover, while the Court has the general power to award "actual expenses reasonably incurred

and reasonable attorney's fees, resulting from frivolous conduct" in civil litigation, no such

conduct has been alleged to have occurred here.  *See* N.Y. Comp. Codes R. & Regs. tit. 22, §

130-1.1(a).  Accordingly, Plaintiffs' claim for attorneys' fees is dismissed without prejudice.

 The Court also agrees with Defendant that Plaintiffs' claim for punitive damages should

be dismissed.  It is well settled that under New York law, Plaintiffs would need to show, among

other things, that Defendant's "conduct is part of a pattern directed at the public generally," in

order to recover for punitive damages on a breach of contract claim.  *TVT Records v. Island Def*

*Jam Music Grp.*, 412 F.3d 82, 93 (2d Cir. 2005) (internal quotation marks omitted); *see also U.S.*

*for Use and Benefit of Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95

F.3d 153, 160 (2d Cir. 1996) (noting that "punitive damages are not [generally] available for a

breach of contract" but may be awarded if, among other things, "the conduct was aimed at the

public generally" (internal quotation marks omitted)); *Enobakhare v. Carpoint*, No. 08-CV4798,

2011 WL 70392, at *12 (E.D.N.Y. Jan. 10, 2011) (noting that under New York law, punitive

damages cannot be recovered for breach of contract unless the offending conduct was, among

other things, "part of a pattern of similar conduct directed at the public generally." (internal

quotation marks omitted)).  Plaintiffs have made no allegation of conduct aimed at the general

public.[8]  Accordingly, Defendant's motion to dismiss the punitive damages claim is granted.

---

 [8] Plaintiffs only allege that Defendant receives "substantial funding from certain public
economic development sources."  (Compl. ¶ 46.)  On its face, however, this claim does not
describe how Defendant's action were directed at the public.

B. Plaintiffs' Motion for Summary Judgment

Plaintiffs move for summary judgment, claiming that the undisputed record demonstrates both an enforceable contract and Defendant's breach of that contract by August 2010.  Summary judgment may be granted where it is shown "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dall. Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003); *see also Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006) (noting that a court must draw all reasonable inferences in the nonmovant's favor).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted).  "When the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted); *see also McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").  "A fact is

19

'material' when it might affect the outcome of the suit under governing law."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  At summary judgment, a court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial.  *See Westinghouse Elec. Corp. v. N.Y.C. Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990).  A court's goal should be "to isolate and dispose of factually unsupported claims."  *Celotex*, 477 U.S. at 323-24.

In denying Defendant's Motion to Dismiss, the Court assumed Plaintiffs' allegations in the Complaint to be true, and, upon evaluating the terms of the financing agreement, reflected in the MOUs and the Term Sheets, determined both that Plaintiffs had plausibly pled the existence of a contract and Defendant's breach of that contract (or, in the alternative, that Plaintiffs had pled a plausible unjust enrichment claim).  With the presumptive truth of Plaintiffs' allegations no longer assumed, the Court denies Plaintiffs' Summary Judgment Motion.

As noted above, Defendant contends that separate and apart from the MOUs and Term Sheets, there were oral agreements that governed Plaintiffs' investment in Defendant. Specifically, Defendant contends that in April and May 2010 the Parties engaged in negotiations which "resulted in two identical complex oral agreements" that predated the Term Sheet and MOUs, and that the latter documents were drafted "[i]n an attempt to formalize the [] oral agreement[s]," but did not "embody all of [their] terms."  (DiCio Decl. ¶¶ 4, 6, 8; Def.'s 56.1 second numbered ¶¶ 1-3.)

Defendant describes these oral agreements as predicated upon an 18-month maturity date.  According to Defendant, under this arrangement Plaintiffs had the option of demanding their investment funds plus 8 percent interest at any time "but [Plaintiffs] would not receive payment until after the lapse of an 18-month maturity date."  (DiCio Decl. ¶ 7; Def.'s 56.1

second numbered ¶¶ 4-5.)  If Plaintiffs exercised their acceleration rights, then, they would be paid "30 days after the maturity date."  (DiCio Decl. ¶ 7.)  Defendant further describes the oral agreements as *requiring* Plaintiffs, after three months, either to convert the Notes to loans (repayable 30 days after the maturity date) or convert the Notes to common stock, unless one of two conditions occurred: (1) Defendant reached a separate agreement with a mobile network, which would forestall Plaintiffs' required decision from three months until the 18-month maturity date; or (2) a qualified financing occurred, which would have "already converted [the Notes] into capital stock."  (*Id*.)  Under Defendant's characterization of these oral agreements, Plaintiffs would have a "right to repayment of their two $50,000.00 investments [on] December 3 and 5, 2011," 30 days after the respective maturity dates of the purported oral agreements between the Parties.  (Def.'s 56.1 second numbered ¶ 5; DiCio Decl. ¶¶ 6-7.)

Adopting Defendant's version of the facts and the terms of the purported oral agreements, Plaintiffs' August 5, 2010 demand letter "converted [their] investments into 8% per annum fixed-rated simple interest loans which would be due . . . December 3 and 5, 2011."  (DiCio Decl. ¶ 30.)  However, Defendant seems to suggest that Plaintiffs' right to convert their investments on August 5, 2010 had been negated by another provision of the purported oral agreements which would delay when Plaintiffs could exercise their demand rights if "(i) [Defendant] signed an agreement with Verizon or (ii) an agreement placing [Defendant]'s platform in service with AT&T, Orange or Vodafone was signed."[9]  (*Id*. ¶ 7.)

_____

[9] Defendant's submissions are somewhat unclear on this point, to put it charitably.  In one affidavit, Defendant contends that the consequence to Plaintiffs of Defendant signing an agreement with one of the named of entities, is that "the period in which plaintiffs could convert their investments to loans . . . was extended until the maturity date."  (DiCio Decl. ¶ 7.)  This seemingly would have no effect on Plaintiffs' August 5 demand letter since it would only have afforded them an extension of time which they did not use.  Elsewhere in its papers construing

Defendant proffers that on July 8, 2010, prior to Plaintiffs' August 5, 2010 demand letter, Defendant signed an agreement with Muzicall that satisfied the second condition by "plac[ing] [Defendant]'s . . . platform on the Orange and Vodafone mobile telephone networks." (*Id.* ¶ 26.) Plaintiffs dispute this claim and a copy of the Muzicall agreement has been provided to the Court. Upon review, the document does not appear to fulfill the second condition above as it is only an agreement to collaborate on the creation and marketing of an interoperable platform, not an agreement to actually place such a platform on one of the named mobile networks. (Pls.' Reply Mem., Ex. A.) In any event, Defendant's proffered explanation of the entire arrangement, while at times murky, is enough to create a dispute over the material facts in this case.

The Court understands fully Plaintiffs' skepticism of Defendant's version of events, apparently shared with Plaintiffs for the first time in Mr. DiCio's Declaration in response to Plaintiffs' motion. Moreover, as Plaintiffs have noted, by the terms of the supposed oral contracts, as outlined by Defendant, the August 5, 2010 demand letter triggered a repayment obligation of the principal amount plus the contractual interest, which would be due December 3 and 5, 2011. Thus, to the extent Defendant has not paid Plaintiffs the principal plus interest by December 3 and 5, 2011, then Defendant apparently would be in breach even of these alleged oral agreements. If true, then the only real dispute remaining would be the amount of interest Defendant would owe Plaintiffs, the calculation of which would depend on whether the breach was in August 2010 or in December 2011. Even this narrow dispute, however, requires a fact finder, thus making Plaintiffs' motion, at this point, premature. Of course, discovery may shed

---

the written Term Sheet, however, Defendant suggests that reaching an agreement with the named entities would "terminate plaintiff's acceleration rights," and presumably not allow them to convert their investments to loans until the 18-month maturity date. (Def.'s Opp'n Mem. 21.)

some light on Defendant's theory of the financial arrangement, and if it does, Plaintiffs will be free to file another summary judgment motion.[10]

### III. CONCLUSION

For the reasons discussed herein, Defendant's Motion to Dismiss Plaintiffs' breach of contract and unjust enrichment causes of action is denied. Defendant's motion, however, to dismiss Plaintiffs' demand for attorneys' fees and punitive damages is granted, the former without prejudice. Also, for the reasons stated herein, Plaintiffs' Motion for Summary Judgment is denied without prejudice.

In light of the limited scope of the dispute between the Parties, the Court directs the Parties to complete fact discovery in the next 90 days. The Court will hold a status conference on July 18, 2012 at 3 P.M.

SO ORDERED.

Dated:        White Plains, New York
              March 30 , 2012

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[10] The Court notes that if, following discovery, inconsistencies in Defendant's representations rise to a level found to violate Fed. R. Civ. P. 11(b), then they could form the basis for attorneys' fees or other sanctions. *See* Fed. R. Civ. P. 11(c); *Margo v. Weiss*, 213 F.3d 55, 61 (2d Cir. 2000) (noting that the filing of false affidavits in an effort to forestall dismissal was objectively unreasonable conduct properly subject to sanction).

23

Service List (ECF)

Anthony Paul Luisi
Joshua E. Kimerling
Cuddy & Feder, LLP
445 Hamilton Avenue
White Plains, NY 10601
(914)761-1300
Fax: (914)761-5372
Email: aluisi@cuddyfeder.com
Email: jkimerling@cuddyfeder.com
*Counsel for Plaintiffs*

Evan Stone Rothfarb
Rothfarb Law, PLLC
61 Broadway, Suite 1900
New York, NY 10006
(212)-480-1010
Fax: (212)-480-1010
Email: evan.rothfarb@rothfarblaw.com
*Counsel for Defendant*